## WALLACE v. BERGER.

1. EVIDENCE: ADMISSIONS. While, as a general rule, admissions made in loose and random conversations are weak and unsatisfactory as evidence, and should be received with great caution, their weight must be determind by the circumstances of each case.
2. SAME: WITHHOLDING OF BOOKS. Where the books of a copartnership are in the possession of one of the copartners, and in a proceeding to settle the copartnership business he fails without excuse to produce them in evidence, the failure will be considered as a strong circumstance against him.

*Appeal from Madison District Court.*

THURSDAY, DECEMBER 4.

BILL to settle and recover a balance claimed to be due under an agreement of partnership entered into in 1855. The partnership is denied in the answer, and the question of fact was referred to John A. Pitzer and others, who found in favor of complainant. This finding was affirmed by the court below, and the accounts submitted to other referees, who found for complainant the sum of $2,720, with interest from the commencement of the action, December 26, 1856. From the decree and proceedings respondent appeals.

*Casady & Polk* for appellant.

*M. L. McPherson* for appellee.

WRIGHT, J. — Did a partnership exist, is the question most warmly contested by these parties. There was no written agreement. Complainant insists, however, that in July or August, 1855, they made a verbal agreement, by which he purchased the one-half of respondents' interest in a certain steam saw mill, and after that, was to be equally interested in, and liable for, all profits and losses. Bearing upon this point, there is an immense amount of testimony. This, on the part of complainant, consists of repeated de-

clarations and admissions of respondent that a partnership did exist,— his own testimony going positively and unequivocally to the fact,— and proof of an entry or entries upon the books, which were kept by respondent, tending to show that he recognized a firm by the name of Berger & Wallace, or Berger & Co. On the other hand, respondent in his testimony, as positively denies the partnership, and attempts to sustain his position by proof of various facts and circumstances which he insists are inconsistent with complainant's claim.

The point is certainly not entirely free from doubt. It is manifest that the strength of complainant's proof is to be found in the declarations and admissions made by respondent. And if these were made up of what are termed "loose and random conversations," we should unhesitatingly hold that this decree should be reversed. For no rule of evidence commends itself more unqualifiedly to our minds than that which styles such conversations weak and unsatisfactory, and which enjoins upon courts to receive them with great caution. The rule is based upon the soundest reason, approved by the experience of all courts, and time only tends to more firmly establish and confirm it. But, on the other hand, if it can be seen that these conversations are not loose and random, but were deliberate and can be precisely identified, they become very satisfactory aids, or, as Mr. Greenleaf expresses it, they are "often of the most satisfactory nature."

It is shown by not less than a dozen witnesses that respondent on different occasions and at different places spoke of the partnership existing. In some conversation he referred to its expected formation, which was prior to the time that complainant insists it had an existence. At other times he spoke of complainant as his partner — of the terms of the partnership — why he took him in — what business they were doing — what had been paid him,— using lan-

guage on all these occasions utterly inconsistent with the hypothesis that he had the sole interest in the property, and that complainant was simply a hired hand. And these conversations were of such a character that we do not see how it is possible for the witnesses to mistake them. Then, it is not a case of one conversation, or the same language heard by the same witness at different times. Unless these witnesses swear falsely, respondent did repeatedly admit the partnership. If we add to this, complainant's own testimony, and the entry in the books, we think the affirmative of the proposition is fairly established. At least, this view is to our minds more satisfactory than the other. It is manifest that complainant is an illiterate man, and yet, after having been asked no less than six hundred and fifty questions on his cross-examination, he sustains himself, as we think, quite well,— certainly as well as respondent, who is a man of more intelligence, and vastly more business capacity. And here we remark, that while complainant's conduct during the existence of the partnership, placed him more in the attitude of a hired hand, than one having an interest in the mill, this is accounted for from the fact that he reposed the utmost confidence in respondent (who was his brother-in-law), and that he was there to work at whatever was required of him, while respondent was entrusted with the duty of measuring and selling lumber, making settlements, paying hands, keeping the books, and all those matters usually devolving upon the active business partner in such a firm. And after giving due weight to all the testimony, and all the circumstances surrounding the case, our conclusion is, that the referees did not err in finding that there was a partnership, and as a consequence, that this finding was properly adopted by the court below.

But it is insisted, that if there was a partnership, the referees erred in stating the account. And here it is urged

(aside from some other matters to be hereafter noticed), that the amount found due complainant was not warranted by the testimony. This depends very much, and indeed almost entirely, upon the amount of lumber made during the existence of the copartnership. To show this, two methods readily suggest themselves. The one is to prove by those conversant with the business of the mill, the probable amount sawed, in view of its capacity and the actual work done, and its value. The other, better, and of course vastly more satisfactory method, is to show by the books kept, if it can be done, the actual receipts and expenses for the entire time. In this case the books were kept by respondent. He sold all the lumber, and received all the money. It is not denied that the books will show the amount of business done, to whom lumber was sold, from whom money was received, the amount of expenses, and very nearly, if not quite, the exact condition of the copartnership at the time of the dissolution. These are in respondent's possession, and he has failed to produce them. Complainant, instead of giving him notice to produce them, and attempting to get at the amount of the receipts in that way, has adopted the other course, and shown by a number of witnesses the capacity of the mill, the amount it cut per day, the probable running time, and the value of the lumber. Respondent, instead of producing the books, attempts to show that these estimates are too large. The referees very evidently adopted the medium, if not the lowest estimates put by witnesses upon the whole amount of lumber sawed. And under the circumstances we are not disposed to interfere with the finding. For while respondent was not *compelled* to introduce the books of account until required by complainant or the court, yet he *might* have done so, and settled this question in all probability beyond any controversy. His failure to do this is certainly a very strong circumstance against him. This action was pending for

near four years. During all these years, complainant was taking testimony to prove the profits of the mill. Respondent, it is true, had removed to the territory of Nebraska, and taken the books with him, but whether before or after the action was commenced does not appear, nor is it material. He had ample time and opportunity to bring them from there, and yet he failed to do so. This failure can, to our minds, only be explained, upon the hypothesis that the books were against him. If they showed that he was not indebted to complainant, or if any, but a small amount, he was certainly inexplicably negligent in not producing them. Under such circumstances, we are not prepared to say that the referees erred in the amount found for complainant.

There are some matters, however, in which they did err. It is shown by the pleadings that some two thousand dollars of debts were outstanding and owing to the firm ; that the liabilities were all paid ; and that respondent had sold the mill, taking, with complainant's consent, in part payment, a certain lot in the town of Winterset, in his own name, at one thousand dollars. It also appears that when the mill was sold, and the business of the partnership brought to a close, a considerable amount of personal property was on hands for disposition. And yet from the entire record it is reasonably certain that the referees made up their account without reference to these several matters. There is no testimony that respondent received the money on these debts,— that he held the title for the lot, otherwise than in trust for the copartnership, nor that the personal property had been so converted or disposed of as to make him individually liable therefor.

We find, therefore, that there was a partnership, and that respondent is indebted to complainant in the amount found in the court below. But for the errors above mentioned, the cause will be remanded, with the following instructions :

1. Respondent shall, within ninety days from the filing of the *procedendo* in the court below, convey to complainant, by good and indefeasable title, the undivided half of said lot (1, block 2, in the west addition, &c.), and will thereupon be entitled to a credit of $500, as of the date of his purchase of the same. If there is a failure in this respect, then the title to said lot shall remain in respondent, freed from any claim of complainant.

2. A receiver is to be appointed whose duty it is to proceed to collect, with all possible diligence, the outstanding debts. He will further ascertain and report the several items of personal property on hand at the time the mill was sold, their actual value, and the value of each. From the proceeds of the outstanding debts, a sufficient amount will first be applied to the payment of the costs of this action, and the balance to be paid into court to abide its order. And if any part thereof cannot be collected, one-half thereof shall be credited on the decree, as of date December 26, 1856. If any part of the personal property remains undisposed of, and can be reduced to possession, he shall proceed to sell the same and pay the proceeds into court, for disposition in the manner above provided for the outstanding debts. And as to such as was on hand when the business was closed, and not reduced to possession, and appropriated to his own use by respondent, he will be entitled to a credit as of that date for one-half of its actual value.

Except in the particulars above named, the decree stands affirmed, appellee to pay the costs of this appeal.